No. 46.—CATHARINE E. BEALL, *et al.* plaintiffs in error, *vs.* The surviving Executors of JOHN FOX, defendants.

[1.] The Statute of 9 *Geo. II. Cap.* 36, is not of force in the State of Georgia.

[2.] The principles of the Statute of 43 *Elizabeth, Cap.* 4, relating to charitable uses, have been adopted and constitute a part of the law of this State.

[3.] The Superior Courts in this State are empowered to exercise general Equity Jurisdiction, in all cases where a Common Law remedy is not adequate ; and have an inherent Jurisdiction over bequests and devises to all charitable uses and trusts, where the same are definite and specific in their objects, and capable of being executed.

[4.] A Court of Equity in Georgia has inherent jurisdiction to carry into effect the charitable bequests of a Testator, according to his intention, independent of the Statute of 43 *Elizabeth.*

In Equity, in Richmond Superior Court. Tried at January Term 1848, before His Honor, Judge HOLT.

The defendants in Error, as the surviving Executors of John Fox, filed their Bill in Equity in the Superior Court of Richmond county, against the plaintiffs in error, as the heirs at law of John Fox, and certain charities, residuary legatees under the Will—charging, that John Fox died in February, 1837, having duly made and published his last Will, a copy of which was attached, wherein, after various specific legacies, he desired " the residue

of the proceeds of his estate to be divided into five equal parts, of which he disposed as follows, viz:

" I give and bequeath one-fifth part of said residue to the " Treasurer of the American Bible Society, and to his successors " in office, for the sole use, benefit and behoof of the said Ameri- "can Bible Society."

" I give and bequeath, also, one-fifth part of the said residue to " the Treasurer of the American Education Society, for the sole " use and benefit of the said American Education Society."

"I give and bequeath one other fifth part of the said residue " unto the Treasurer of the American Board of Commissioners " for Foreign Missions, and to his successors in office, for the sole " use, benefit and behoof of the said American Board of Commis- " sioners for Foreign Missions."

" I give and bequeath one other fifth part of the said residue to " the ' Treasurer of the Augusta Free School Society, and to his " successors in office, for the sole use, benefit and behoof of the " said Augusta Free School Society."

" And I give and bequeath the remaining fifth part of the said " residue to the Treasurer of the Domestic Missionary Society of " Georgia, and to his successors in office, to and for the sole use, "benefit and behoof of the said Domestic Missionary Society of " Georgia."

The Bill charged that the " American Bible Society," estab- lished 1816, remained unincorporated until 1841, when it was in- corporated by an Act of the Legislature of New York—that the " American Education Society," was incorporated under its pres- ent name, in 1820, by the Legislature of Massachusetts—that the " American Board of Commissioners for Foreign Missions," were incorporated by an Act of the Legislature of Massachusetts, in 1812—that the " Augusta Free School Society," was incorporat- ed by an Act of the Legislature of Georgia in 1821.   And that the " Domestic Missionary Society of the State of Georgia," was formed on the 4th April, 1825, at the General Session of Hope- well Presbytery, at Lexington, in this State—that the object of its formation was to send ministers wherever the Society should deem it expedient, in the State of Georgia, in building up feeble churches—that said Society, though unincorporated, has been in active operation ever since, and that Elizur L. Newton of the County of Clark, in said State, was at the time of he death of

John Fox, and has been ever since, the Treasurer thereof. The Bill further charges that said associations, through their officers, have made frequent application for the fund thus devised and that the heirs at law, on the contrary, notify the Executors not to pay out any part thereof. Under these circumstances they pray the direction of the Court, and filed their Bill for that purpose.

The several answers admitted the facts stated in the Bill.

At January Term, 1848, of the Superior Court of said County, the cause was submitted to a Jury, when the Counsel for the heirs at law, requested the Court to charge the Jury :

1st. That this Court, in the exercise of its Equity jurisdiction, has no power to grant the prayer of the Bill, having no powers as a Court of Chancery, but such as are granted by the Judiciary Act of 1799, and subsequent Statutes.

2nd. That if the Court had such powers, the Statute 9 Geo. II. Cap. 36, is of force in this State ; and by virtue of said Statute all said residuary legacies are void.

3rd. That two of the Residuary Legatees, to wit, " The American Bible Society" and " The Domestic Missionary Society," not being bodies corporate and politic, either at the date of the devise, or the death of the Testator, were incapable of taking under said devise.

4th. That the Statute 43 Eliz. Cap. 4, is not of force in this State.

5th. That this Court, as a Court of Chancery, has no inherent power, independent of said last mentioned Statute, by which it can carry into effect the supposed intention of the Testator, in the residuary clause of his Will.

All which points the Court refused to charge, but did charge the Jury :

" 1st. That this Court is a Court of general Equity jurisdic-" tion, having full power to grant the relief here prayed for."

" 2nd. That the Statute 9 Geo. II. Cap. 36, is not and never " was of force in Georgia."

" 3rd. That the want of corporate powers in two of the legatees, " is not material ; the party intended to take, being clearly point-" ed out, and a Trustee able to hold, this Court will carry out the " Testator's intentions for the benefit of the Charity."

" 4th. That the Statute 43 Elizabeth, Cap. 4, is of force in " Georgia ; but whether it is or not does not affect this case ; for,

"5th. Independently of that Statute, this Court has all the in-
"herent power necessary to carry out these bequests."

To all which exceptions were filed, and error assigned on each
point.

GOULD & STARNES, for plaintiff in error.

JENKINS & CONE, for defendants in error.

*Argument of* E. STARNES, for the plaintiff in error.

A Court of Equity in Georgia, has no power to grant the
prayer of this bill, and instruct the Executors, by its decree, as o
the payment of these legacies.

The Courts of Equity in Georgia, are of limited jurisdiction,
having only those powers which are granted by Statute.

Our jurisdiction in Chancery, is not co-extensive with the Chan-
cery jurisdiction in England. Chancery jurisdiction in England
was almost unlimited. It was, in the words of Sir Wm. Blackstone,
"a vast and extensive jurisdiction," 3 *Black. Com.* 47.

1. Chancery jurisdiction in England, as representing the *pa-
rens patriæ*, the King had a prerogative jurisdiction, which gave
it the custody of infants, idiots and lunatics, *and the superinten-
dence of all charities.*

2. The King is universal guardian of infants, who delegates it
to the Lord Chancellor. 1 *Black. Com.* 382, 384. 2 *Fonb. Eq.*
5th Ed. 225. Ch. Pre. Reg. 155.

By virtue of this power he might appoint Guardians to infants
who are without them, and *control* infants, and their estates. 4
*Wheat.* 1 *Con. Rep. U. S.* 385. 1 *Black.* 384. As to Charities,
see *Jer. Eq. Juris.* 234.

Now this prerogative jurisdiction is wanting to our Courts.
The appointing of guardians for infants, is given by our laws to
other Courts.

No provision is made by them for a superintendence over char-
ities. We have no such officer as the Chancellor in England—
none to whom the Sovereignty has delegated prerogative rights—
and we have no prerogative rights.

2. The Chancery jurisdiction in England, combined the exer-
cise of Common Law powers with extraordinary Equity powers for

the correction of any matter of complaint in which the law, by reason of its universality, was deficient.

Now the matters of complaint are comparatively few which our Courts of Chancery may correct, by reason of the deficiency of the law on account of its universality; and these matters are specified by our Statutes.

The *objects*, therefore, of our Equity jurisdiction, are prescribed and limited, though the modes of proceeding on the administration of those powers which are granted, are as extensive as those in the Chancery jurisdiction of England.

Let us see what are the objects of our Equity jurisdiction, and what the Equity powers of our Courts.

I. The Judiciary Act of 1799, gives the following:

1. The Superior Courts shall exercise the powers of a Court of Equity, in all cases where a Common Law remedy is not adequate to compel parties to discover on oath, all requisite points necessary to the investigation of truth and justice.

2. To discover transactions between Copartners, and Co-Executors.

3. To compel distribution of intestate's estates, and payment of legacies.

4. To discover fraudulent transactions for the benefit of creditors.

5. Power to entertain Bill for discovery of testimony in aid of Common Law action.

6. The proceedings in such cases to be by Bill, and such other proceedings as are usual in such cases, until the sitting down of the cause for trial.

[Therefore, when the Bill contains a prayer for *Injunction, ne exeat, quia timet, &c.*, in any such case as those enumerated, the same shall be granted—it being a proceeding usual in such cases.]

II.   7. The several Acts regulating injunctions.

III.   8. The Acts regulating *ne exeats.*

IV.   9. Summary remedy against persons " running " or " about to run " estates of orphans.   *Act of* 1814.

10. Act of 1836, authorizing one distributee to bring his bill.

11. Act authorizing the appointment of Masters in Equity.

12. Act of 1839, directing character of decree in Bill for specific performance as to land.

13. Act of 1838, as to publication.

These are the powers granted by our Legislature to our Courts of Equity.

Let us now trace our legislation on this subject for a moment. And first—*Act of* 1790, *Wat. Di. Wat. Di.* 481, 488, *Act* 1792. *Ibid*, 621, *Act of* 1797.

These Acts show that up to 1799, the powers of our Courts of Equity were general.

Now the Act of 1799, evidently limits this jurisdiction. *Wat. Di.* 706, 707. *See Act of* 1820. *Prince Di.* 447.

The relief sought by this Bill is not authorized by this last Act it is clear, and if not by it, it does not exist.

This view is supported by the Courts in other States where the legislation on this subject is similar to our own. 17 *Mass. R.* 327. 6 *Pick.* 395. 20 *Pick.* 327. 3 *Fairf.* 456. 5 *Greenl.* 303.

[II.] But if this Court has authority to entertain this Bill and grant the prayer of Complainants, then we urge that all the bequests in this Will are void, because they give *by devise* the proceeds or a-vails of lands and tenements to charitable uses.

At Common Law lands could not be devised. *By the Statutes of Wills,* (32, 34, *and* 35, *Henry* VIII.) *devises of lands* (*except to corporations*) *were authorized.*

But in tender regard to an object usually so pious as a bequest in charity, the English Courts early decided that the bequest, to be unlawful, must be *direct*, and allowed conveyances to uses, to avoid the Statute.

A later Act was passed by the Parliament of Great Britain, and her Chancery practice modified, so as to render legal by intendment of law, even vague and uncertain bequests of lands for *charitable purposes. This Act was the* 43d *Eliz. Chap.* 4.

In process of time, this right was found to be so pernicious to society, and injurious to commerce, as to make it necessary for the Parliament to pass an Act whose construction renders void all gifts, grants or bequests of lands, or the proceeds of lands for charitable purposes, except such as were conveyed by and in accordance with certain forms there prescribed. *This was the* 9 *Geo.* II. *C.* 36. *Fonb. Eq.* 460. *Note.* This Statute is of force in our State. It was enacted in 1736—to go into effect on the 24th day of June 1736.

This Act has not been held to be of force in other States, for

the obvious reason, that it was passed long after the period of their colonization. It is of force in Georgia, for the following reasons:

On the 25th February 1784, our Legislature passed an Act, (known as the "adopting Statute,") by which it adopted the Common Law of England, and such of the Statutes as were usually in force in the Province of Geo. on the 14th day of May, 1776, so far at they were not contrary to the Constitution, Laws and Form of Government then established.

It is necessary therefore, *first*, to ascertain what laws were in force in the Province previous to 14th May, 1776.

In this search, the following rules have been thought to be the best and soundest guides.

1. *Chief Jus. Parsons's opinion.* 2 *Mass. R.* 534.
2. *Chief Jus. Shaw's opinion,* 16 *Pick.* 107.
3. *Rule adopted by Judge Schley Schley's Di. Pref.* 23.

Tried by these tests was this Statute of force in Georgia, anterior to the Revolution, or might it have been called into force had a case under it, arisen? Let us examine.

1. These rules declare, that our ancestors brought with them at the time of the settlement of the Colony, all the Common Law, with the Statutes amendatory thereof, applicable to their situation, and all other Statutes applicable to their condition.

Out of this rule arise three inquiries.

1. Was this Statute in existence at the time of the settlement of the Colony?

2. Was it amendatory of the Common Law, and applicable to their condition?

3. Was it otherwise a Statute applicable to their condition?

1. What was *the time of the settlement* of the Colony?

The time of the settlement, was the time of the colonization—for the Provincial Legislature of 1770, by Act, declared the Province entitled to the Laws of Great Britain, which existed at *the time of the colonization. Schley Di. Pref.* 28.

Now this time of settlement, or colonization, extended from the year 1733 to 1752, when Georgia became a Royal Colony.

To ascertain then, the time of their settlement or colonization, we must make History, rather than Law Books, our authority.

The several emigrations extended from the 1st Feb. 1733, (the time when the first emigration landed,) until 1752. *Carroll's His-*

*Col.* 392, 393.   Dr. *Stevens' History*, 90, 106, 112, 122, 126, 127, 128, 131, 437, 214, 276.   This period was of course the time of the settlement, and the colonization of the Province.

But there is further Historical evidence of this fact.   Until 1742, the Province was a mere military colony, without any but the most limited Civil government.   It was in point of fact, therefore, after the establishment of Civil government, whenever this was, that the laws which are the birthright of Englishmen, were of force in the Colony.   *Car. His. Col.* 372, 394, 405.   *Stevens' History*, 216, 217, 220, 221, 225, 276, 277, 278, 281, 381, 387, 389, 401.   I may suggest, besides, that the Acts of force in the State of Georgia extend to this period, and indicate this conclusion.   *See Schley's Di. passim.*

All these things show, that the time of the colonization extended to the year 1752—the period when the Royal Government was extended over the Colony.

Emigrations extended almost to this time—and the imperfect form of government (for a part of the time strictly military,) suiting the process of colonization which the trustees were pursuing, existed up to that period.

But at this period, the Colonists were " favored " [for the first time] with the liberties and privileges enjoyed by their neighbors " —to use the words of a historian to whom I have referred.

They had then, indeed, the enjoyment of the laws of England, which laws, then existing, and applicable to their condition, were from that time of force in the Colony.

Now this Act of 9 George II. was then existing—having been passed in the early settlement of the Colony.

2. Was it amendatory of the Common Law ?

1. It was amendatory of the Common Law.

*By the Common Law lands were not devisable by will.*

By the Statutes 32, and 34, and 35, Henry, (commonly called the Statutes of Wills,) lands were made devisable to all persons " except bodies politic and corporate "—that is, into mortmain. 2 *Cain. Ca.* 357.

By the Statute of 43 Eliz. C. 4, lands might be devised even to a corporation, *for charitable uses,* and imperfect and uncertain bequests were made valid.

By the Statute of 9 Geo. II. C. 36, all alienations of land, by

devise or otherwise, (except by deed under certain regulations there prescribed,) to charitable uses, were declared to be void.

Here then was a Common Law principle, amended and modified by the several Statutes—and the latter is of course amendatory of the Common Law.

2. Was it applicable to the condition of the Colonists at the time of the colonization?

It is self-evident, that that which was applicable to their condition, it was their policy to pursue.

Let us see what was the policy of the infant Colony.

It is obvious, that it was their policy to increase the number of their inhabitants, and to enlarge their trade and commerce to the greatest possible extent. That these were, and should have been two of the chief objects of their policy, all will agree. Now in these very objects, the Statute in question had its origin, which is shown in these two things.

1. The mortmain acts had their origin in the feudal system. This statute, though not strictly a mortmain act, is, in some sort, a modification of the mortmain acts ; and its tendency is to check the too great accumulation of lands in the hands of corporations.

Now the trustees established military fiefs in Georgia—limited the amount of land which each settler might possess—and required service of him, in consideration thereof. 1 *Car. His. Col.* 308, 394.

After the surrender of the charter, numerical strength was still of equal importance, and it was still the policy of the colonists to keep large bodies of land out of one hand, and especially of the dead hand.

2. This act of 9 Geo. II. though said to be, in some sort, a modification of the mortmain acts, was created, not so much with reference to the dead hand, as in consideration of trade and commerce. It it somewhere said to be in aid of commerce. *Jer. Eq. Jur.* 236.

If one of those two principal objects of policy of the infant colony, was to encourage trade and commerce, it was its interest not to lock up lands by their accumulation in the hands of a charitable corporation, or of any person else, or to throw the proceeds of their sale into such a channel by devises—for then the legatee could invest the fund inland, and the result deprecated would be obtained by circuity.

It was to meet a result like to this, that the Statute was fram-ed and construed in the mother country, and the reasons seem to be much stronger for its application in the colony.

We have seen that the trustees were jealous of the accumulation of land in one hand and it was the policy of the colony to prevent it during their administration.

Afterwards, the same principles dictated a similar jealousy on the part of the colonists, though they were more prudent and liberal in their limitation of the number of acres to each man.

Yet still they did limit this accumulation, for they needed a general division of lands to attract settlers, cultivators, and defenders of the soil, and they needed a free interchange of bargain and sale of this, the chief source of their wealth in the colony.

And the impress of this policy still lingers in our head-right acts.

This seems very clear—but a doubt may arise as to the existence of such a state of things in the colony anterior to the revolution, as would have raised occasion for the application of this act.

There were no great corporations in the province, and it may be supposed there were no charities calculated to lock up lands, or absorb funds at this period. But this is a mistake. There were such institutions in the early days of the colony.

The Saltzburgers, (with the aid of English benevolence,) had established an Orphan Asylum at Ebenezer as early as 1736.

From this, the celebrated George Whitfield took his hint, and founded the orphan house at Savannah. *Harris' Oglethorpe*, 182, 183, 184. *Morse's Univ. Geog.* 740.

To the support of this charity, this remarkable man devoted his energies, collected large sums of money, and procured endowments for many years. Bishop Berkeley, also contributed to the same.

Here, then, were two public charities to support, in which good and great men in both hemispheres were interested.

It would have been easy for colonists, (whose children were so deeply interested in the result,) dying possessed of lands, to have left them to these institutions, which might have soon amassed great wealth by this means, had they been permitted to do so.

But we have seen that this would have been contrary to the policy of the province. And we cannot doubt, that if it had been

attempted, the strong policy which we have recognised would have called this statute into use.

In short, is it not probable that this statute did restrain and prevent such conveyances to these praiseworthy institutions?

If, then, this Statute, was, by its nature, calculated to protect and encourage the policy of the colony, it was of course applicable to its condition.

Existing, therefore, at the time of the colonization of the province, amendatory of the Common Law, and applicable to the condition of the colony, we conclude that it was of force in Georgia previous to the 24th day of May, 1776, and of course, adopted by our Statute.

There is yet another view of this subject. According to the opinion of an eminent lawyer, (which rule Judge Schley found exceedingly useful to him while making his compilation,) there is another guide in this inquiry, viz : All the English Statutes of a *general nature*, existing at the time of the settlement of the colony, were applicable to the condition of the Colony, and of force on the 24th May, 1776.

This Statute was of a general nature.

The mortmain acts, confessedly, were of a general nature—the first provision against mortmain, found its way into Magna Charta.

The Statute of *Edward de Religiosis,* 7 *Ed.* 1, *S.* 2, *C.* 1, afterwards declared it to be illegal, to convey lands into mortmain.

The Statutes of *Wills,* 32 *Hen.* VIII, *C.* 1, and 34, & 35, *Hen.* VIII, *C.* 5, authorise devises of lands, except to bodies politic or corpo-rate—ths is into mortmain.

Other Statutes continued the prohibition. But by construction of 43 *Eliz. Ch.* 4, (commonly called the Statute of Charitable uses,) these acts were modified so as to allow corporations to take lands by devise to charitable uses.

These mortmain acts, as they affected the real estate of the kingdom were of course of a *general nature.*

They have been held (upon this principle, in part, as I suppose,) to be of force in various of the American colonies, as in *Virg.* 3 *Leigh* 480. In *Ken.* 2, *Dana,* 175. In *Penn.* 2, *Kent Com.* 285, 282.

The 43 Elizabeth has been, and is now of force in North Carolina and Kentucky. *Ang. & Am. on Cor.* 114. 1 *Hawks,* 96. 2 *Dana,* 170.

Pennsylvania and Massachusetts have adopted the principle of the Statute. *Au. & Ames on Corp.* 115.

It was repealed in Virginia in 1792.

Its doctrines recognised by 3d Sec. of Declaration of Rights in Maryland. *An. & Am.* 115.

The Statutes of Will, were also of a general nature, and have always been acknowledged to have been of force in Georgia, and perhaps every other State in the United States.

Now these mortmain acts, and the Statute of Wills, were modified by the 43 of Elizabeth. And the 43 Elizabeth in its turn modified by S. Geo. II.

Of course, this act must be of the same general nature with those modified by it.

And being of a *general nature*, and existing at the time of the colonization, it is found to be of force in the colony, on 24th May, '76.

If this Statute be of force in Georgia, its effect is to render void all bequests to charitable uses, not conforming to its requirements. *Ram. on Wills*, 25, 26, 27. 2 *Fonb. Eq.* 212. 3 *Bron. C. R.* 373. 1 *Ves.* 108. 4 *Bron. C. R.* 156. 2 *Rop. on Leg.* 104, 105, 106. *Amb.* 20, 614, 651.

It does not prohibit charities, it only prescribes certain solemn forms by which they shall take effect, and provides protection to a commercial community against the influences of ignorance and superstition, operating on weak minds in the dying hour.

The experience of ages in England has found this to be the true policy. The same causes exist to make it our policy.

It is true that the Courts in several of our States have inclined to the support of charitable bequests by Will, in any form, but it is to be attributed, perhaps, to the limited experience of our people in this regard, very limited as compared to the English, the light of whose experience has streamed along the vista of so many centuries.

Some of our Judges have manifested pious sympathies with testators of these charities. This was natural.

So the English Judges often inclined to make the general law yield to the interesting features of a particular charity. But experience taught them at length that this was not wise. And this act was made so plain as to defy evasion.

Reflection must convince us that the policy of this Statute should be the policy of our legislation.

And the Courts, in administering the law, will, no doubt, lose

sight of the attractive features of the particular case, of the effort to apply general principles of justice—will, in short, merge the sympathy of the man in the reason of the judge. *Amb.* 20. 3: *Leigh*, 450.

III. If this act be not of force in the State of Georgia, several very intricate questions arise in giving direction to this case.

Two of the legatees we unincorporated at the time of the execution of this will.

One of them has been since incorporated; but the heirs at law plead that both of these legacies are void.

1. They clearly would have been void at Common Law. We have no Statute of our own applying to such a case.

What is the effect of Common Law principles and of English Statutes upon the question.

Such a bequest is void at Common Law. *Shep. Touch. Si. Devise,* 509. *Pow. on Dev.* 337. 1 *Black. R.* 16. *Sand. on W. & T.* 62, 466. 2 *T. R.* 672. 24 *Wheat.* 1.

A church or society that has no legal incorporation, cannot hold real estate under a will, still less can persons, in the name of office derived from such church or society. 3 *Verm. R.* 400. 9 *Mass. R.* 259. 8 *John. R.* 385.

2. If then, these legacies would be void at Common Law, and there is no remedy in our State legislation, the question arises, whether or not there is any remedy in the Statutes of England of force in this country?

If the 43 *Eliz. Cap.* 4, be of force in our State, there is a remedy, certainly, by which a Court of Chancery can make valid these charities, imperfect and defective upon Common Law principles, and carry them into effect.

But the 43 *Eliz.* is not of force here—

First, Because it was repealed by 9 *Geo.* II. *Cap.* 36, so far as to deprive the Chancellor of authority to carry into effect bequests to charities which are not executed according to its forms, viz : which are not conveyed by deed, executed 12 calendar months before the donor's death, and enrolled within six months from the time of its execution.

It was thus repealed in June 1736, before the Colony of Georgia was so organized into a Civil and Legislative government, that the Statutes of a general nature, or amendatory of the Common Law, (of which this was one,) might become of force in the Colony.

Secondly, If the 43d *Eliz.* ever was of force in Georgia, it cannot have been of force since the passage of our Judiciary Act of 1799 ; because, as I have shown, from that time, the powers of our Courts of Equity have been limited to those which are granted by Statute, or adopted by our reviving Act.

Thirdly, If the 43d *Eliz.* be not of force in Georgia, there remains no remedy by which these charities can be sustained—unless there be inherent power in our Courts of Chancery, as such, to apply such remedy.

That such power existed in the English Chancery *at one time*, and exists in all those Courts of our States, (colonized before the enactments of 9 *Geo. II. C.* 36,) whose Chancery practice is modelled on English jurisprudence, is the opinion of the Supreme Court of the U. S. (at 'the present day,) and of many of the Supreme Courts of the States.    And this we concede.

But our Court of Equity has no such power in Georgia, because—

First, Whether the 9 *Geo. II.* is of force in Georgia or not, it seems certain that at the same time that it repealed the 43d *E-liz.* it in effect repealed all the Chancery principles by which these defects could be remedied ; inasmuch as its requirements and provisions are entirely inconsistent with both the one and the other.

If so, there was no such Chancery power, (inherent) by which the Court could effect this remedy, existing in England at the time Georgia was colonized, and therefore none could be of force in this country.

Secondly, If we are right as to the limited character of our Equity jurisdiction, then of course, our Court of Equity has no jurisdiction over charities.

C. J. JENKINS, for defendant in error, cited the following points and authorities :

1. The Superior Court, in the exercise of its Chancery jurisdiction, has power to grant the prayer of the Bill.    The Act of 1799 confers on that Court, general Chancery powers.    The decree prayed is within the powers specially granted.    *Act of* 1799.    *Prince*, 447.

2. The Statute of 9*th George II. Chap.* 36, is not of force in

Georgia. 1 *Kelly*, 604. *Roper on Legacies*, 129, 130. *Ward on Legacies*, (18 *L. L.)* 86. *Powel on Devises*, 18. 2 *Merivale*, 143. *Angel & Ames*, 117.

3. The Statute of 43*d Elizabeth, Chap.* 4*th*, is of force in Georgia, and if not, the Superior Court has power, as a Court of Chancery, to carry into effect the manifest intention of the testator in his residuary clauses. 18 *Pickering*, 107. 9 *Cowen*, 487, (*See* 486 *to* 489.) *Angel & Ames on Cor.* 119. 4 *Metcalf,* 378. 24 *Pickering*, 146. 2 *Howard*, 127. 7 *Johnson's Chan.* 292. 1 *Richardson's E. R.* 99.

4. The bequests in the residuary clauses are to natural persons (not named, but so designated as to be easily identified,) in trust for certain charitable uses. The answers make known these persons by name, and pray for a decree to them, upon the trusts contemplated in the will. and the decree is so framed. This removes all difficulty as to the unincorporated societies.

5. The Augusta Free School Society, is, by its charter, expressly empowered to take and hold real estate. So are the other incorporated societies.

Mr. Cone, for the residuary legatees, made the following points.

1st. The Superior Courts of Georgia have general Equity Jurisdiction, and are clothed with powers to protect and enforce charitable donations. 1 *Stevens' History of Georgia*, 387, 391. *Watkins' Digest*, 220, 254, 338, 389, 391, 422, 439, 480, 621, 707. 1 *Kelly's Repts.* 23, 27, 239, 40, 377, 8. 2 *Do.* 420, 460.

2d. The bequests to the residuary legatees, are charitable bequests. *Shelford on Mortmain*, 61, 63. *Duke*, 82, 109. *Tothill*, 34. *Pophim*, 139. 1 *Repts.* 26. 1 *Equity Cases Abridged*, 95. *Pl.* 3, 1 *Vesey, Jun.* 243. 10 *Do.* 22. 14 *Do.* 7. 1 *Vesey, Sen.* 43. 2 *Do.* 275, 426. 3 *Brown's Chan. Cases*, 171. 4 *Do.* 69. 2 *Cox*, 301. 2 *Barnwell & Alderson*, 97. 6*th Stanton*, 359. *Klyng Repts.* 34. 2 *Equity Cases Abridged,* 193. 1 *Jarman on Wills*, 191.

3d. The Statute of 9th George the Second, making void devises and bequests of charitable uses, is not of force in Georgia.

1st. Because it was not passed until after the colonization of

Georgia.  1 *Stevens' Hist.* 89, 91, 95, 99, 101.  *Shelford on Mort-main*, 99.  1 *Blackstone's Com.* 108.

2d.  Because, by its provisions, it does not extend to the colonies, and therefore does not bind them.  1 *Blackstone's Com.* 108.  7 *Repts.* 34.  5 *Vesey*, 240.  8 *Do.* 96.  2 *Salkeld*, 411, 666.  4 *Burrow's*, 2500.  2 *Brown's Chan. Cases*, 328.  *Cowper*, 204.  *Ambler*, 428.  2 *Pierre Williams*, 75.

3d.  Because it is purely an English Statute, not applicable to the situation of the colonies, and Georgia in particular, and not made of force by our adopting Statute.  *Shelford on Mortmain*, 101, 194.  1 *Ball & Batty*, 154.  2 *Merivale*, 143.  *Fonblanque, Equity*, 490, 502.  2 *Kent's Com.* 223, 229.  *Prince's Digest*, 570.

4th.  But even admitting it to be of force, the bequests to the residuary legatees are not within its provisions.  *Shelford on Mortmain*, 98, 101.  9 *Modern Repts.* 222.  2 *Burn's Ecclesiastical Law*, 555.

5th.  The Statute of 43 Elizabeth, commonly called the Statute of charitable uses, is of force in Georgia.  *Shelford on Mortmain*, 61, 62.  *Hotchkiss' Digest*, 20.  1 *Stevens's Hist.* 62, 3, 6, 7, 8, 73, 4, 5, 320, 350, 354.  16 *Pickering*, 107.  24 *Do.* 146, 153.  2 *Kent's Com.* 285.  4 *Do.* 507, 8.  1 *Hawk's*, 96.  2 *Dana*, 170.  1 *Devereaux, Chan. Repts.* 276.  2 *Iredell's Equity Cases*, 255.  4 *Dana*, 357.

6th.  Admitting, however, that Statute not to be of force, the bequests to the treasurers of the unincorporated societies are valid, independent of that Statute, and will be protected and enforced by virtue of the general Common Law Equity Jurisdiction of the Court of Chancery.  *Shelford on Mortmain*, 200.  1 *Blythe's Repts.* 347.  1 *Chan. Cases*, 157.  2 *Pierre Williams*, 119.  2 *Vesey, Sen.* 328, 426.  *Duke*, 135, 380, 644.  2 *Gibson's Codex*, 1158.  2 *Vernon*, 344.  2 *Equity Cases Abridged*, 198.  1 *Vesey, Jun.* 475.  1 *Coke*, 24, *(Porter's Case.)*  *Pophim*, 67, 8.  2 *Levins*, 167.  2 *Pierre Williams*, 102.  1 *Eden's Repts.* 10.  *Ambler*, 351.  1 *Wm. Blackstone*, 90.  *Wilmot's Notes*, 1, 26.  1 *Mylne & Keane*, 376.  1 *Drury & Warren*, 258.  7 *Vesey*, 36.

American cases on this point :  2 *Peter's*, 566.  3 *Do.* 99.  8 *Connecticut Repts.*  9 *Cowen*, 479.  17 *Sergeant & Rawle*, 89.  1 *Pennsylvania*, 51.  *Magill vs. Brown, (pamphlet.)*  5 *Watts*, 493.  1 *Hawk's*, 96, 7.  12 *Mass.* 5, 37.  16 *Pickering*, 107.  24 *Do.*

146.　9 *Cowen*, 427, 437.　20 *Wendell*, 119.　7 *Page*, 77.　3 *Peters*, 501.　2 *Howard*, 127.　3 *Shotwell*, 9.　1 *Voss*, 96.　4 *Dana*, 534.　1 *Hoffman*, 201.　7 *Vermont*, 241.　1 *Richardson's Equity Repts.* 99.　*Do. Law Repts.* 174.　9 *Ohio Repts.* 203.　*Metcalf*, 378.

See also 2 *Kent's Com. 5 edition*, 287, 288.　2 *Story's Eq.* 550, 545, 556, 563, 4, 566.

7th. Uncertainty as to the persons who are to enjoy the benefit of the bequests does not affect their validity.　*Shelford on Mortma'n*, 359, 367, 8, 370.　3 *Brown's Chan. Cases*, 517.　1 *Vesey, Jun.* 464.　7 *Cranch*, 45.　2 *Peters*, 256.　6 *Do.* 436, 7.　2 *Story's Equity Jurisprudeuce*, 542, 3.

The bequests of the residuary legatees are good and valid as ordinary trusts at Common Law, independent of their charitable character.

MR. GOULD, in conclusion, for plaintiff in error, cited, *Cas. Temp. Holt*, 341.　3 *Leigh*, 476, 8.　*Story's Com.* §§1168, 1170, 1194.

*By the Court.*—WARNER, J. delivering the opinion.

This cause has been argued with ability, by the counsel on both sides, and in a manner too, which commands the entire approbation of the Court.　The various points relied on, have been distinctly made, and the authorities cited, appear to have been well considered by the counsel, *before the argument*, which has enabled them to present their views in a clear, and concise manner, without embarrassment to themselves, or the Court.

Without noticing all the topics discussed in the arguments, as illustrative of the main grounds of the controversy, we shall confine ourselves to the principal points, made by the record.

On the trial of the cause in the Court below, the counsel for the heirs at law, who are the plaintiffs in error, requested the Court to charge the jury.　First, that the Court, in the exercise of its Equity jurisdiction, has no power to grant the prayer of the Bill, having no powers as a Court of Chancery, but such as are granted by the Judiciary Act of 1799, and subsequent Statutes.

Second, that if the Court had such powers, the Statute of 9 *Geo.* II. *Cap.* 36, is of force in this State, and by virtue of said Statute, all said residuary legacies are void.

Third, that two of the residuary legatees, (to wit) the American Bible Society, and the Domestic Missionary Society, not being bodies corporate and politic, either at the time of the devise, or the death of the testator, were incapable of taking under said devise.

Fourth, that the Statute of 43 *Eliz. Cap.* 4, is not of force in this State.

Fifth, that this Court, as a Court of Chancery, has no inherent power, independent of said last mentioned Statute, by which it can carry into effect, the supposed intention of the testator, in the residuary clause of his Will; which charge, as requested, the Court refused to give, but charged the contrary, to which the counsel for the heirs at law excepted; and now assign the same for error here.

[1.] We will first consider whether the Statute of 9 *Geo.* II. is of force in this State.

We are of the opinion that this Statute never was of force in Georgia. It was not enacted, until after the settlement of the Colony, and was not properly adapted to the circumstances of the Colonists, at the time of their settlement in 1733—nor on the 14th May, 1776.

The Statutes of mortmain were introduced into Great Britain during the establishment and grandeur of the Roman church, to check the ecclesiastics from absorbing in perpetuity, in hands that never die, all the lands in the kingdom and thereby withdrawing them from *public*, and *feudal charges.* 2 *Kent's Com.* 282.— The extension of Christianity was one of the leading objects which the trustees had in view, in the settlement of our infant Colony; and we can hardly suppose there was any danger, that the cunning of the Priesthood would exert undue influence over the minds of weak and dying persons, in the Colony of Georgia, so as to require the restraints imposed by the mortmain Acts of Great Britain. We are not aware that the early Colonists, or their descendants, were at all likely to bequeath, or devise their worldly substance, *to superstitious uses;* to maintain a Priest to say mass; to maintain him or others to pray for the souls of the dead; to maintain perpetual obits, lamps, torches, &c., used to help save the souls of men out of Purgatory. There existed no reason, taking into view the condition of the Colonists, from the time of their first settlement, up to the time of our adopting the

Common and Statute Laws of England, why the mortmain Acts of Great Britain should have been adopted. Nor are we aware, even at the present time, that our people are so much inclined to indulge in *charitable* donations for the advancement of christianity, education, and other charitable objects, as to require legislative restriction for the protection of their heirs, in making their last wills and testaments. But the Act of 9 *George* II. has been adjudged in England, to be an Act of *local* policy, complicated with local establishments, intended to have a *local* operation ; and that it did not extend to the Colonies. *The Attorney General vs. Stewart,* 2 *Merivale's Rep.* 143.

[2.] Although it is not necessary, in the view which we have taken of this case, to determine whether the Statute of 43 *Elizabeth* is of force in this State; yet, as it is our judgment that the *principles* of that Statute were applicable to the circumstances of the people of Georgia, at the time of the settlement of the Colony, as well as at the time of our adoption of the Common and Statute laws of England, we will express our views in relation to it.

The Colony of Georgia was founded in charity ; and hence the necessity of invoking the aid and protection of the Statute, so far as its *principles* were applicable. We do not desire to be understood, that the legislature intended to adopt all the *forms* of proceeding required by that Statute ; but, as it had long been the standard of charity, in England, and clearly distinguished between what should be considered *charitable* and *superstitious* donations, it is reasonable to suppose, that the Colonists brought with them, the same distinction made by the Statute of Elizabeth, and adopted it as a rule of their conduct, in their new home.

That such objects of charity as are specified in that Statute, as well as such objects as had, by the judicial construction of the Courts of Great Britain, been held to be within its provisions, would have been consid-red by our ancestors, as *lawful and proper objects of charity* ; and hence it is, we say, that in our judgment, the *principles* of the Statute of 43 *Elizabeth,* have been adopted in this State.

The first, third, and fifth grounds of error, will be considered together ; involving as they do, the jurisdiction of the Court, and the capacity of two of the residuary legatees to take, under the will of the testator.

[3.] It is urged on behalf of the plaintiffs in error, that the Superior Courts in Georgia, have only a *limited*, and not a *general* jurisdiction, over Equity causes.

The 53 Section of the Judiciary Act of 1799, declares "that the Superior Courts in the. several counties, shall exercise the powers of a Court of Equity, *in all cases where a Common Law remedy is not adequate* to compel parties in any cause to discover on oath all requisite points necessary to the investigation of truth and justice; to discover transactions between Copartners, and Co-Executors; to compel distribution of intestates' estates, and payment of *legacies*; and to discover fraudulent transactions for the benefit of creditors, and the proceedings in all such cases shall be by Bill, &c.    *Marbury and Crawford's Dig.* 307.    The complainant's bill having been filed, for the direction of the Court *as to the payment of the legacies* under the testator's will, we think, there can be no doubt as to the jurisdiction of the Court, in this case, even should it be limited to the particular cases enumerated in the Act, as insisted on by the counsel for the plaintiffs in error; but we are not willing to place our judgment on such narrow grounds.

It was evidently the intention of the Legislature, to confer upon the Superior Courts *Equity jurisdiction;* and we think the words of the Act are broad enough to confer *general* Equity jurisdiction in all cases where a Common Law remedy is not adequate.

The words of the Act are—" the Superior Courts in the several counties, shall exercise the powers of a Court of Equity, *in all cases where a Common Law remedy is not adequate."*    The argument for the plaintiffs in error is, that the Equity jurisdiction of the Superior Courts, is to be confined to the particular cases enumerated in the Act of 1799, and subsequent Statutes; that our adopting Statute of 1784, did not embrace the system of Equity jurisprudence as it existed in Great Britain on the 14th May, 1776, as a part of the Common Law; that the Equity jurisdiction of that Kingdom was derived from the *Civil Law*, and formed no part of the Common Law, which was recognized and adopted as the law of this State.    If the words of the Judiciary Act of 1799, would render the exercise of *general* Equity jurisdiction a *doubtful* question, independent of any *judicial construction* heretofore given to that Act; yet, when we take into consideration the contemporaneous construction which has been given to it, in favor of

Beall *vs.* The Surv'g Ex'rs of Fox.

the exercise of such general Equity jurisdiction, in all cases where a Common Law remedy was not adequate by our Courts, for a period of nearly *fifty years*, without any attempt, on the part of the Legislature, to restrict its exercise, we cannot *now* consider it as an open question. That the equitable jurisdiction of the Court of Chancery in Great Britain, is founded upon and follows the Civil Law, in many of its leading doctrines, is unquestionably true; although the eminent jurists of that Kingdom have not always been willing to make such an admission. It is not so easy, says Mr. Justice Story, to ascertain the origin of the equitable or extraordinary jurisdiction of the Court of Chancery. By some persons, it has been held to be as ancient as the Kingdom itself; others are of a different opinion. In a note to the original text, the learned Commentator calls our attention to the vindication of the judgment given by King James in the case of the Court of Chancery, 1 *Collectanæ Juridica*, where it is said, " It cannot be denied but that the Chancery, as it judgeth in Equity, is a part of the law of the land, and of the *ancient Common Law*, for Equity is, and *always hath been, a part of the law of the land*. 1 *Story's Com. on Equity*, 41, 42. Whatever may have been the *origin* of the equitable jurisdiction of the Courts of Equity in Great Britain, it is quite certain that the principles of Equity jurisprudence were incorporated into, and constituted an important part of the judicial system of that country, long anterior to the American Revolution. *Blackstone* says : General customs, or the Common Law, properly so called, is that law by which proceedings and determinations, in the King's ordinary Courts of justice, are guided and directed, which are the four Superior Courts of Record, the Chancery, the King's Bench, the Common Pleas and the Exchequer. But how, inquires the learned Commentator, are these customs or maxims of the Common Law to be known, and by whom is their validity to be determined ? The answer is, *by the Judges in the several Courts of justice*. They are the depositaries of the laws; the living oracles who must decide in all cases of doubt, and who are bound to decide according to the law of the land. And indeed, these *judicial decisions* are the principal and most authoritative evidence, that can be given of the existence of such a custom as shall form a part of the Common Law. 1 *Blackstone's Com.* 68, 69. The principles of equity, as administered in Great Britain, were never intended to create a *new law*,

but were introduced for the purpose of assisting and giving effect to the general laws of the realm. Equity follows the law, but does not control it. The office of Equity is to protect and support the Common Law, and carry it into *practical* effect, to secure its protecting influence for the benefit of the subject, where by reason of its universality it would fail to accomplish that object. Equity, says *Blackstone*, in its true and genuine meaning, is the soul and spirit of all law. Here, by *equity*, we mean nothing but the *sound interpretation of the law*. 3 *Blackstone's Com.* 429, 431. When we adopted the Common Law of England, we adopted it as an *entire system*, so far as it was properly adapted to the circumstances of our people ; and the principles of Equity, as there administered, for the purpose of giving a *practical* effect to those laws, constituted a part thereof.

The principles of Equity, as enforced by the Court of Chancery in Great Britain, were as necessary to give complete efficacy to the laws, in the Colony of Georgia, as in that country from whence the laws were derived. The first Provincial Governor of the Colony, was therefore invested with the custody of the Great Seal, and as Chancellor within the province, had the same powers as the Lord High Chancellor of England. *Stevens' History of Georgia, Vol.* 1, 387. A Court of Chancery was ordered, for hearing and determining all matters of Equity, as early as 1754, to be held before the Governor as Chancellor; and a Master, Register, and Examiner, were appointed as officers of the Court. *Ibid,* 391. The Ecclesiastical or Canon laws of England, were derived from the *Civil* law, yet, they constitute a part of the *unwritten,* or Common Law of that kingdom. They owe their validity, says Blackstone, because they have been admitted, and received by *immemorial usage and custom.* 1 *Black. Com.* 79. The same remark might with propriety have been made, with regard to the principles of Equity, derived from the *Civil* Law. The Law Merchant, however different from the general rules of the Common Law in its origin, has been ingrafted into it, and made a part of it. The Law Merchant, says Mr. Justice Buller, in *Masten vs. Miller,* *(*4 *Term Rep.* 342,*)* "is a system of Equity, founded on the rules of Equity, and governed in all its parts, by plain justice and good faith." A great proportion of the rules and maxims which constitute the immense code of the Common Law, grew into use by gradual adoption, and received from time

to time, the sanction of the Courts of justice, without any legislative act or interference.    It was the application of the dictates of natural justice and of cultivated reason, to particular cases.    In the just language of Sir Matthew Hale, the Common Law of England is "not the product of the wisdom of some one man, or society of men, in any one age; but of the wisdom, counsel, experience and observation of many ages of wise and observing men."    1 *Kent's Com.* 471.    We have endeavored to show, that the principles of Equity were introduced into the Jurisprudence of Great Britain, at a very early period, not for the purpose of creating any *new law,* but to give a more perfect and practical effect to the *general laws* of that country, and thereby became a *necessary part* of that judicial system of laws, which we adopted in this country, so far as the same were suited to our circumstances and condition; that when the Legislature of 1799 declared the Superior Courts shall exercise the powers of a Court of Equity, in all cases where a Common Law remedy is not adequate, they intended the Superior Courts should exercise and adopt as a rule for their government, the same principles of Equity which had been recognized and settled by the Court of Chancery in England, prior to the American Revolution, so far as the same were not contrary to the constitution, laws, and form of government of this State.    The Act of 1784 adopted the laws of England, adapted to our circumstances.    The Act of 1799 confered Equity powers on the Superior Courts, necessary to give to those laws a complete and *practical application,* for the benefit of the citizens of this State, in as full and ample manner, as the same existed in Great Britain, for the benefit of the subjects of that kingdom.    We have not only adopted the laws of England suited to our circumstances, but we have created the necessary judicial machinery, to give to those laws a *practical* and *beneficial* effect, and such we understand to be the office and duty of a Court of Equity, and such we understand to have been the object of the Legislature, in 1799, in conferring Equity powers on the Superior Courts.

[4.] But with regard to the jurisdiction of Courts of Equity over *charitable* bequests and devises, although originally derived from the Civil Law, we have high authority for saying, the principles by which those Courts are governed in relation thereto, have been for ages incorporated into the laws of England. 2 *Story's*

*Equity Jurisprudence,* 393, *section* 1141.    *Philadelphia Baptist Association vs. Smith and Robertson,* 3 *Peter's Rep.* 481, 2.    4 *Kent's Com.* 508.    *Vidall, et al. vs. Girard's Ex'rs.* 2 *Howard's Rep.* 196.

The next question is, as to the validity of the bequsts, to the American Bible Society, and the Domestic Missionary Society. These two societies, were not incorporated at the death of the testator.

The bequests are to the Treasurer of each Society, and his successors in office; for the sole use, benefit, and behoof thereof. The record discloses, that Wm. Whitlock, Jun., is the Treasurer of the American Bible Society; and Elizur Newton, the Treasurer of the Domestic Missionary Society; and that the American Bible Society was established for the purpose of encouraging a wider circulation of the Holy Scriptures, in the common version, without note or comment.    The object of the Domestic Missionary Society was, to send ministers wherever they might think it expedient, within the State of Georgia, and to assist in building up feeble churches.

These charitable trusts created by the testator, are not only *lawful,* but highly commendable; intended to enlighten and improve both the social and moral condition of his fellow men.

It is a cardinal rule in the construction of wills, to give effect to the *intention* of the testator, when the same can be done without violating any settled principle of the law.    The authorities cited at the bar, in our judgment, establish the following propositions: that in the construction of *charitable* bequests, the Court will be liberal, so as to carry into effect the *intention* of the testator; that where the charitable intent can be discovered from the will, a Court of Equity will carry such intent into execution, and support the charitable purpose; that the Court will not suffer an equitable interest to fail for want of a *trustee* to support it; that it never has been considered as an objection to a charitable use, because it was general, and in some respects indefinite; unless there was an uncertainty as to the amount intended to be given, or the general object of the use was of so *uncertain* and *indefinite* a character, that it could not be executed; that a Court of Equity has an inherent jurisdiction in cases of charitable bequests and devises, and that cases of charity in the Courts of Equity in England, were held valid, and executed independently of, and previous to the Statute of 43 *Elizabeth.*    2 *Kent's Com.* 287.    2 *Ro-*

*per on Legacies,* 140. *Executors of Burr vs. Smith, et al.* 7 *Verment Rep.* 241. *Vidal, et al. vs. Girard's Executors,* 2 *Howard's Rep.* 127. *Attorney General, vs. Jolly,* 1 *Richardson's Eq. Rep.* 99. *Coggeshall vs Pelton,* 7 *John Ch. Rep.* 292. *Griffin vs. Graham,* 1 *Hawks' Rep.* 96. The charitable bequests in the will of the testator, John Fox, to the Treasurer of the American Bible Society, and to the Treasurer of the Domestic Missionary Society, for the *sole use, benefit, and behoof of said Societies,* are definite, and the specific objects of the trusts pointed out. The Treasurers of the respective Societies, and their successors in office, are constituted *trustees* for the sole use, benefit, and behoof thereof. But if there had not been any *trustee* named in the will, or the one named should refuse, or be incapable of acting, the Court would, by virtue of its inherent jurisdiction over *charitable uses and trusts,* lay hold of the trust fund, and carry into effect the *charitable intention* of the testator, by appointing a trustee for that purpose, if necessary. Let the judgment of the Court below be affirmed.