BECKWITH, trustee, *vs.* THE RECTOR, WARDENS AND VESTRYMEN OF ST. PHILIP'S PARISH *et al.*

1. A conveyance of property for the support and propagation of religion, is a charitable use, and this includes gifts for the erection maintenance and repair of church edifices, for the promotion of worship, the support of the ministry, etc.

2. The rules governing the establishment and administration of charitable trusts are different from those applicable to private trusts, in giving effect to the intention of the donor and in establishing the charity. In private trusts, if the *cestuis que trust* are so uncertain or so incapable of taking, that they cannot be identified or cannot by legal or equitable proceedings claim the benefit conferred on them, the gift will fail and revert to the donor or his heirs. But if a gift is made for a public charitable purpose, it is immaterial that the trustee is uncertain or incapable of taking, or that the objects of the charity are uncertain and indefinite. It will, nevertheless, be sustained. Courts look with special favor upon such trusts.

3. An alienation of the legal title by the trustee of a charitable trust will be considered, *per se,* as a breach of his trust. It is his duty to preserve the trust property and act favorably to the trust interests; and if he sells the trust property, he must be prepared to show that the transaction was beneficial to the charity; and in the absence of such proof, the sale will be treated as a breach of trust.

4. Charitable trusts are not within the statute of uses (27 Henry VIII.) so as to merge the legal title into the equitable estate. Such trusts are, by their very nature, continuing, executory trusts.

5. Therefore, where the title to a certain lot was vested in the bishop of a diocese for the use of the church in a certain division, and the title to other lots was vested in him for the benefit of a parish in his diocese, upon the incorporation of such diocese and parish the title was not divested from the bishop and vested in them.

6. Where the title was conveyed to E. " of the Protestant Episcopal church in the division of Georgia," to have and to hold to him the said E., "Bishop as aforesaid, for the use of the Protestant Episcopal church in said division of Georgia, in fee simple," such trust did not attach to the person of E., but to the office of bishop, and passed to his successor in office.

October 31, 1882.

Religious Corporations. Trusts. Charities. Corporations. Statute of Uses. Before Judge HILLYER. Fulton County. At Chambers. May 22, 1882.

To the report contained in the decision, the following should be added, in connection with the sixth division thereof: Mitchell made a deed to Stephen Elliott, Jr., of Monroe county, "and of the Protestant Episcopal church in the division of Georgia." The *habendum* and *tenendum* clause was as follows:

"To have and to hold the said bargained premises unto him, the said Stephen Elliott, Jr., bishop as aforesaid, for the use of the Protestant Episcopal church in said division of Georgia in fee simple; and the said Samuel Mitchell, his heirs, executors and administrators and assigns, the said bargained premises unto him, the said Stephen Elliott Jr., his heirs and assigns will warrant," etc.

One question in the case was, whether this vested a personal trust in Elliott or a trust in him as bishop, which passed to his successors in office.

Beckwith, trustee, *vs.* The Rector, Wardens and Vestrymen of St. Phi.ip's Parish *et al.*

HARRISON & PEEPLES; S. HALL; FRANK H. MILLER, for plaintiff in error.

E. N. BROYLES; McCAY & ABBOTT, for defendants.

SPEER, Justice.

On the 13th of April, 1847, Samuel Mitchell, for and in consideration of his desire to promote the cause of morals and religion in the land, and one dollar paid, sold and conveyed a certain lot in the town of Atlanta, known as fraction block No. 1, containing three-fourths of an acre, to Stephen Elliott, Jr., of the Protestant Episcopal church, in the division of Georgia, to have and to hold the same as bishop aforesaid, for the use of said church in said division in fee simple.

By deed, dated 16th June, 1847, L. P. Grant conveyed to Stephen Elliott, Jr., lots 33 and 34. Stephen Elliott, Jr., executed a disclaimer of title of these last two lots, except as bishop of the the diocese of Georgia, in trust, for use and benefit of the parish of St. Philip's in Atlanta, debarring his heirs, declaring the same to be rightfully vested in his successor or successors in office as bishop of the diocese of Georgia. This deed of disclaimer is not dated, but recorded 8th November, 1866, in Fulton county.

A parish was organized in 1847, known by the name of St. Philip's church, the articles of association acknowledging and acceding to the doctrine, discipline, worship, and the constitution and canons of the Protestant Episcopal church in the U. S., and constitution and canons of the same church in the diocese in Georgia.

The diocese of Georgia was incorporated in May, 1877, by Chatham Superior Court, under the style of the "Protestant Episcopal church of the diocese of Georgia," under the act of 1876, and in said charter, the bishop and standing committee and their associate members of said church, were, with other powers, granted the right to hold real

and personal property necessary for its organization, "including all property and right of property heretofore held by said church under its unincorporated organization."

On the 6th of October, 1881, a petition, averring "that a church had been established, was presented to Fulton superior court, and an order passed incorporating the rector, wardens and vestrymen of St. Philip's parish, Atlanta, for twenty years, giving them authority, with other corporate rights, to take possession of, hold and alienate any property, real or personal, that may be held in trust for said parish."

On December 5th, 1881, the rector, wardens and vestry resolved to mortgage the entire property for $15,000, and the bishop, as trustee, was requested to give his consent to this mortgage. This the bishop, on the 12th of December, 1881, declined to do.

On Easter Monday, 11th of April, 1882, at a parish meeting for an election of the wardens and vestry of St. Philip's church, "It was resolved to mortgage for $10,000, all the property which belongs to the parish of St. Philip's." The complainant, as trustee under both deeds, on 9th of May, 1882, filed this bill to prevent the realty passing under either deed from being so encumbered, as a cloud upon his title and endangering the trust estate."

The court below ruled that, from the incorporation of the parish, the title to the lot held in trust for the parish passed to the corporation, and that the bishop of the diocese, as trustee, had no such interest in the lot conveyed by Mitchell as authorized him to maintain the bill,—retaining the injunction pending the writ of error only as to the lot conveyed by Mitchell.

The assignments of error on this judgment of the chancellor below are:

(1.) In refusing the motion of complainant to strike the answer, because not properly verified.

(2.) In holding and deciding that the incorporation of the rector, wardens and vestrymen of St. Philip's parish, was and is an incorporation of the parish of St. Philip's.

(3.) In holding and deciding that the incorporation of a parish would divest a trustee of title previously held by such trustee for the benefit and use of said parish.

(4.) In holding and deciding that the incorporation of the rector, wardens and vestrymen of St. Philip's parish divested the complainant of all title and interest in and to the lots described in exhibits B and C to complainant's bill, and that the said corporation, upon their creation, became invested with a perfect title to said lot.

(5.) In holding and deciding that complainant does not, as trustee or otherwise, hold the title to the lot described in exhibit A to complainant's bill, and that complainant did not in reference to this lot succeed as trustee, his predecessor in the office of bishop of the Protestant Episcopal church in the diocese of Georgia, and that complainant has no such interest in said lot as could enable him to maintain said bill.

(6.) In refusing to grant the injunction prayed for.

There are no issues as to the facts between these parties, and hence no review here as to abuse of discretion in the judgment of the chancellor below in refusing the injunction. But the questions presented are questions of law upon the facts admitted.

We deem it unnecessary to pass upon the three first grounds of error assigned in the record, as, in our judgment, a ruling on the other grounds embraces the main and controlling question of law involved.

There are two deeds in this record conveying these lots, one by Samuel Mitchell, conveying one of said lots to Stephen Elliott, Jr., bishop of the diocese of Georgia, for the use of the Protestant Episcopal church, and the other by Stephen Elliott, Jr., conveying the other lots to the bishop of the diocese of Georgia, in trust for the use and benefit of the parish of St. Philip's, in the city of Atlanta. These deeds originally vested the title of the lots in the grantee for the uses and benefits as stated.

The complainant below claims, as the successor of Bishop

Elliott in the office of bishop, that he holds the title for the uses therein declared.

The defendants in error claim that, by the subsequent incorporation of the diocese and the parish of St. Philip's, the trusts became executed and the legal title held by the bishop united or merged into the use, and hence both legal and equitable title by operation of the statute of uses, known as the statute of 27 Henry VIII, passed to the trustees of said several corporations, to-wit, the diocese of Georgia and the parish of St. Philip's.

1, 2, 3. It certainly was the clear intent and purpose of the donor and grantor in the creation of these trusts to provide for and promote religious instruction and worship, the one in the diocese of Georgia, and the other in the parish of St. Philip's. When a trust is created for such a purpose, they are known and defined in law as "charitable trusts." The Code defines a trust making provision for " religious instruction or worship," a "charity" cognizable by a court of equity. Code, 3157. Perry, in his work on trusts, says: " Charitable trusts include all gifts for religious or educational purposes in their ever varying diversity." 2 Perry, §687; 4 *Ga.,* 404; 46 *Ga.,* 88.

The rules of charitable trusts, in their establishment and administration, are very different from those that are applicable to private trusts, in giving effect to the intention of the donor and in establishing the charity. In a private trust, if the *cestuis que trust* are so uncertain or are so incapable of taking that they cannot be identified, or cannot by legal or equitable proceedings claim the benefit conferred on them, the gift will fail, and revert to the donor and his heirs. But if a gift is made for a " public charitable purpose," it is immaterial that the trustee is uncertain or. incapable of taking, or that the objects of the charity are uncertain and indefinite, still it will be sustained. A public charity begins where uncertainty in the recipient begins. Courts look with favor upon such trusts, and take special care to enforce them, to guard them

from assault, and protect them from abuse. " Charity in thought, speech and deed, challenges the admiration and affection of mankind." " Christianity teaches it as its crowning grace and glory, and the inspired apostle exhausts his eloquence by setting forth its beauty and the nothingness of all things without it."

The support and propagation of religion is clearly a charitable use, and this includes gifts for the erection, maintenance and repair of church edifices of worship, the support of the ministry, etc. 2 Pom. Eq, 587–8. Law of Trusts, (Tiffany & Bullard), 232, 236–39–40. Where the general intention is "charity," the court will not permit mere matters of form to defeat it. 30 Penn., 437; 12 La., 301.

In charitable trusts, the *cestuis que trust* or beneficiaries are not and need not be capable of taking the legal title, and when property is given for the poor of a parish, or for the education of youth, for pious uses, or any charitable purpose, the beneficiaries are generally unknown, uncertain and incapable of taking or dealing with the legal title, but such trusts are valid in equity, and courts of equity will administer them and protect the right of the beneficiary. 1 Perry on Trusts, 66.

An alienation of the legal title by the holder or trustee will be considered, *per se*, as a breach of his trust. It is his duty to preserve the trust property, act favorably to the trust interest, and if he sell the trust property, he must be prepared to show the transaction was beneficial to the charity, and in the absence of such proof, the sale will be treated as a breach of trust and be set aside. Law of Trusts, (T. & B.), 274, and authorities there cited.

4, 5. Are these charitable trusts subject to the statute of uses, as declared in 27 Henry VIII ; or in other words, do such trusts ever become executed, so as to merge the legal into the equitable estate under that statute? The intent of the statute of 27 Henry VIII was undoubtedly to do away wholly with the separation between the legal

and beneficial ownership of lands, and to abolish uses and trusts altogether, but such a construction has not been fully carried out by the courts, for various reasons.

Mr. Dwight, in his argument in the "Rose will case" says, speaking of charitable trusts or uses: "The very nature of the case precludes the idea that a statute could have been enacted with the intent to vest the title in the poor, or in children who were the beneficiaries of the charity." The essential notion of a charity is that the property shall be kept away from the temporary beneficiary, and to preserve it for them for all time to come as they arrive one after another. "Charitable uses are neither within the scope nor the words of the statute. The only design of that statute was to convert equitable into legal estates by annexing the legal title to the equitable right of possession; but the persons for whose benefit a charity is created have no estate or interest in the lands upon which the statute could possibly operate. They are mere beneficiaries having the right, and nothing more than the right, to compel the performance of the trust according to its terms and the intention of the donor. A valid charitable use must always remain, and can only be enforced as a trust unaffected by the provisions of the statute, since considering it simply as a use, there is not and never can be any person in whom it can be executed. As the rents and profits are to be applied to the benefit of a succession of persons in perpetuity, there is not and never can be a *cestui que trust* to whom the legal estate, if that of the trustee is divested, can be given without destroying the charity and defeating forever the intention of the founder." The very nature of this trust makes it a continuing executory trust. There is always something for the trustee to do, not only in protecting the title, but in ascertaining the objects of the trust, improving the property, and determining the beneficiaries who are uncertain and fluctuating. 4 Wheat. 646. It is conceded that there can be no merger of the legal and equitable estate so long as the trust is ex-

ecutory.   Does the trust become executed by the creation of these corporations?

It cannot be denied that, under the statute of uses, when a trust becomes executed, it is a destruction of the trust estate, because an actual estate is thereby created in the beneficiary as effectually as if done by conveyance and livery of seisin at common law.  2 Washburn, 415.   Under this trust the trustee is charged with the duty of promoting the cause of religion and morals, and as it is continuing and perpetual, we cannot see how it can be executed and thus terminated  without doing violence to the intention of the donor.   It is impracticable for this trust to be executed in the beneficiaries, for they are ever changing by removals, accession, deaths and births.   Is it executed in these corporations, as claimed by defendants in error; that is, is the complainant as trustee divested of the legal title in these lots by the creation of these corporations, and does this legal title merge or unite with the  equitable estate in these corporations?   The cases cited by the defendants in error in support of this proposition in 4 Wend., 497 ; 3 Paige, 296; 2 Wash., Va., 35 ; and 5 Watts and S., 323, all seem  to rest on  decisions made in N. Y., and upon a statute of that state.   In that state the statute of 27 Henry VIII, and 43 Elizabeth, (known as the statute of charitable  uses) were both repealed as early as 1788, and the state enacted in lieu thereof a statute that expressly provides, "That property held in trust for an unincorporated religious society would vest in an incorporation of such society."   This N. Y. statute declares, "That the trustees of a church are authorized and empowered to take into their possession and custody all the temporalities belonging to such church, congregation or society, whether the same consists of real or personal estate,  and whether the same shall have been given, granted or devised directly to such church, congregation or society, or to any other person for their use."   Revised Stat. N. Y., 3 Vol. 282. In Georgia the only statute of nses in force is that of 27

Henry VIII, as found embodied in §§2313, 2314, 2315 of the Code.

So far as our investigation has extended, we can find no case where it has been held, under the English statute of uses, that a charitable trust such as this, continuing and per-petual, would be terminated by creating a corporation em-bracing the beneficiaries. On the other hand in the case of the Methodist Society of Georgetown *vs.* Bennett *et al.*, 39 Conn., 293, where "land was conveyed to certain trustees 'in trust, for the members of the Methodist P. church of G.,' to be holden 'by them and their successors in office forever, for the proper use and behoof of said church, agreeably to the Methodist P. Church Discipline,'" and "the book of discipline provided for the election of trustees to each church, and made it their duty 'to hold the property of the individual churches in trust for the use and benefit of the members thereof,' with power, when authorized by two-thirds of the male members over twenty-one years of age, to dispose of property so held, but on no other condition," it was held 'that the legal title did not vest in the church as a corporation."

If this legal title in the complainant is by the statute of uses merged into the equitable or beneficial estate, and both unite and form but one estate, then these corporations would hold this property free from any trusts, for when-ever this merger takes place the equitable or beneficial estate ceases, and the whole title is in the corporation un-incumbered with the trusts. For as before stated, when under the statute of uses a trust becomes executed by the merger of the legal into the equitable estate, an ac-tual estate is thereby created in the beneficiary as effect-ually as if done by conveyance with *livery of seisin* at common law. 2d Wash., 415. If this trust is executed by the creation of these corporations, and they take both the legal as well as equitable title, then their actual estate is absolute, the trust is terminated, and the intention of the donor is defeated. But it is said the perfect title

would vest in these corporations " according to the terms
and limitations of the trust." Code, §2314. The mean-
ing of this is, they would take just such a legal estate as
the beneficiaries had and held as an equitable estate, and
as their equitable estate was designed in these deeds to be
perpetual, so would the legal estate be perpetual and the
trust would no longer exist.

The English statute of uses, 27th Henry VIII, was
enacted in hostility to trust estates. Its purpose was to
destroy and put an end to such estates and vest the title,
both legal and equitable, in the beneficiary of the trust,
and thus create in him an actual estate free of the trust;
and if this trust is executed, as claimed, by these corpora-
tions coming into existence, they take the actual, abso-
lute title disencumbered of any trust. To claim they
would hold as trustees for the beneficiaries subject to the
uses and terms of the deeds from the donors, would not
be in conformity with either the letter or the spirit of the
statute of uses, as applied to executed trusts. Code, 2314.

In 2d Michigan reports, 113, the court decided that the
creation of a corporation after the conveyance of the land
in trust would not permit the corporate officers to man-
age the corporate property contrary to the laws and usages
of the church. In Calkins *vs.* Cheney, 72 Illinois, 462;
the court stated, " most obviously, property held in trust
for the benefit of a religious denomination cannot be held
subject to be conveyed away or improved or used in ac-
cordance with the dictates of a society or congregation."
In Watts and S. R., 25, it was held, "An act of incorpo-
ration after the deed of trust is always, with respect to
this grant, to be construed consistently with the deed, and
the congregation must enjoy the land granted in subor-
dination to the uses described in the deed. The charter
cannot change the effect of the grant in any particular.
The grant is a contract, the obligation of which cannot be
impaired by any authority." 4 Wheaton, 15; *Ib.*, 518,
624. But whether the title to these lots is in the trustee

or the corporation, it is still a trust. The 2335 section of the Code declares: "Trustees are not authorized to create any lien on the trust estate, except such as are given by law." In *Iverson vs. Saulsbury*, decided at the February term, 1882, not yet reported, a majority of this court held, that after full notice to all parties, a chancellor could not in vacation authorize a trustee to encumber the trust estate by mortgage."

6. Was there error in the court's holding, as complained of in the 5th assignment of error, that the lot conveyed to Stephen Elliott, Jr., bishop, in trust for the Protestant Episcopal church in the division of Georgia, was a trust attaching to the person and not to the office of bishop, and that the trust did not pass to his successors in office?

In Georgia, the courts apply liberal rules of construction to carry out the intention of the donor. 4 *Ga.*, 404; 25 *Ib.*, 420. A bond payable to Gilmer, governor, and his successors in office, is payable to the officer and not the individual. 15 *Ga.*, 423. So if only payable to the governor. 1 *Ga.*, 583. So by the terms of or a close analogy with section 2343 of the Code, this trust would vest in the present complainant as the successor. This was evidently the intention of the donor. The trust was lodged for the benefit of a diocese in its bishop, its highest officer, and who, by the rules of his church government, was the regular successor of a long line of officials preceding him. No other provision was made by the deed for any other succession, and the conclusion is reasonable, he intended this trust to pass to the successors in office of the first trustee.

We conclude, therefore, that the complainant, to whose predecessor these conveyances were executed, is not divested of his legal title to these lots of land by the incorporation of the "diocese of Georgia," and "the parish of St. Philip's church," under the "statute of uses," as of force in this state, and that without his consent there could be no lien or mortgage created on this trust

property, and that the chancellor below erred in not grant-
ing the injunction as prayed for.

Judgment reversed.

JACKSON, Chief Justice, concurred *dubitante.*